UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KAREN L. McFADDEN,                :    CIVIL NO. **1:03-CV-2237**
                                  :
          Plaintiff              :    (Magistrate Judge Smyser)
                                  :
     v.                           :
                                  :
UNITED STATES OF AMERICA,        :
DEPARTMENT OF THE ARMY,          :
                                  :
          Defendant              :


**MEMORANDUM OPINION,**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**


_____This is a Federal Tort Claims Act claim brought against the United States by the plaintiff, Karen L. McFadden. Jurisdiction of the court is under 28 U.S.C. §§ 1346(b)(1), 2671-2680.  The plaintiff exhausted the administrative claim procedure, and the case has proceeded to a trial in this court.


The plaintiff is the wife of Gunnery Sergeant Rodney McFadden, who in 2002 was stationed at the Army War College in Carlisle, Pennsylvania.  On April 4, 2002, the plaintiff resided with her husband and their five children in a residence on the grounds of the Carlisle Barracks.

The claim arises from events occurring on April 4, 2002, when the plaintiff sought professional mental health care at the Dunham Army Health Clinic at the Carlisle Barracks.  Her claims involve the disclosure on the same day by clinic staff of information provided to them during and as a result of the plaintiff's visit to the clinic.

After the exhaustion of the administrative claim, the plaintiff filed her complaint on December 9, 2003.  An answer was filed on February 17, 2004.  A non-jury trial was held on May 5, 6 and 9, 2005.  Testifying at trial were the plaintiff, Rodney McFadden, Dr. Richard Sleber, Ann Walker, Kathryn Ellis, Dr. Christine Maier, Brenda Sampson, Dr. Timothy J. Michaels, Ginger Wilson-Gines, Ines Roe, Gunnery Sergeant Michael McDonald, Lieutenant Colonel Dale Crabtree, and Austen Gray, M.D.   Documentary exhibits were introduced.

The plaintiff's claims are that there was a breach by the defendant through its employees of a confidential relationship (Count I), that the defendant violated the Pennsylvania Mental Health Procedures Act, 50 P.S. § 7101, *et seq* (Count III), and that the defendant invaded the plaintiff's privacy (Count IV).  A claim of an intentional infliction of

2

emotional distress was withdrawn during the trial.  (Trial Tr. 69).

### *Trial Testimony.*

The trial testimony of material significance to the events of April 4, 2002 is summarized as follows.

The plaintiff testified that on April 4, 2002, she felt sad and depressed, was crying uncontrollably and had thoughts of suicide.  She went to the Dunham Clinic at the Barracks for her daughter's pediatric appointment and told the pediatrician that she had suicidal thoughts.  She was referred to Dr. Maier, who was her primary care provider, and in turn to the social worker department.  She filled out numerous forms, and signed them.  Nobody explained the forms to her.  It was never explained to her that certain information might need to be revealed.  She was seen by Ann Walker, a therapist.  She told Walker that she had a four month old baby and had thoughts of killing herself.  The plaintiff came to believe that she needed to be hospitalized.  Ms. Walker told the plaintiff that a bed in a hospital would be located, and told her that her husband's commanding officer would be informed of the situation.  The

plaintiff pleaded with Walker not to inform the commanding officer.  Walker did, however, contact Lt. Col. Crabtree, the commanding officer of her husband.  Walker asked Crabtree to arrange for the plaintiff to be transported to the hospital. Crabtree arranged for Gunnery Sergeant McDonald, a fellow marine, to take the plaintiff to the hospital.  After the plaintiff reacted angrily to this arrangement, an arrangement was made for an ambulance to take her to the hospital.  The plaintiff was angry and embarrassed because she felt that her expectation of privacy and confidentiality had been breached. She did not want her husband's co-workers to know about her problems.  She felt betrayed by Walker.  She lost trust in people, psychiatrists and therapists.

The plaintiff did continue to see Ms. Walker after her hospitalization.  They discussed the plaintiff's marriage.  She disclosed her anger with her husband and volatile disagreements where she threw things in the house.  The plaintiff observed that Walker inferred that there was spouse abuse in the marriage, and the plaintiff was outraged and furious about this inference.

4

The plaintiff knew of a killing on the Carlisle base of an officer's wife by her husband just after the plaintiff arrived at the base and not long before April 4, 2002.  She acknowledged her handwriting on forms provided by Dunham Clinic personnel for her review and signature on April 4, 2002.  She does not recall whether she refused to sign a form in which she would have promised not to try to kill herself.  She acknowledged that she wrote on April 4, 2002 that she had come to the clinic "for aggressive and violent behavior.  I do not feel like myself.  I have no control over my behavior..."

In the testimony of Gunnery Sergeant Rodney McFadden, he stated that his wife had experienced emotional outbursts before April 4, 2002, and that the March 2002 homicide of an officer's wife, a "close friend" of his wife, was a difficult experience.  He related incidents in 2002 where his wife threatened to or gestured to or tried to kill herself.  None that he specifically remembered occurred before April of 2002. On the afternoon or evening of April 3, 2002, the couple had an argument.  Rodney McFadden wanted his wife to go for psychological help.  She threw things on the floor.  She scratched his face, neck and chest.  She was upset, pulling and tugging at him.

On April 4, Rodney McFadden was informed by Lt. Col. Crabtree, his commanding officer, that his wife was with clinic staff.  His commanding officer saw the scratches on his face.  Lt. Col. Crabtree "put me on the spot and let me know we had a problem."  Crabtree told him not to contact his wife.

He was visited at his home on the morning of April 4, 2002 by Brenda Sampson.  He was asked what was going on.  He told Sampson about his wife's outburst the day before.  Ms. Sampson saw the scratches on his face.  Later, his wife called him.  He went to see her in the Chambersburg Hospital.  Later, he learned that he and his wife were being investigated by the Family Advocacy program for spouse and child abuse, and he was very upset and hurt by that.  He considers his wife to have been injured by the episode.

Ann Walker testified that she is a social worker and a therapist at the Dunham clinic.  She saw the plaintiff on April 4, 2002.  The plaintiff was extremely depressed and wanted to be treated.  The first day (April 4) was a crisis intervention session.  Walker felt that the plaintiff should be hospitalized.  The plaintiff came to agree.  Walker contacted Lt. Col. Crabtree, informing him that the plaintiff needed

inpatient psychiatric hospitalization.  She told this also to
Gunnery Sergeant McDonald, who it was understood at the time
was to transport the plaintiff to the hospital, and did so
because she felt that McDonald needed to know that the
plaintiff might act impulsively and might harm herself.  Later,
when she observed scratches on Mr. McFadden's face, she told
Lt. Col. Crabtree about this.  She told Lt. Col. Crabtree also
that the plaintiff had stated that she was afraid of her
husband and did not want her husband to be near to her.  She
told Lt. Col. Crabtree that the plaintiff had a great deal of
rage towards Mr. McFadden.  Walker was in her view of it
providing therapy to the plaintiff and also evaluating the
plaintiff in a family advocacy context, which involved
considerations of possible spouse and child abuse.

     Ms. Walker in her testimony reviewed forms and
questionnaires completed by the plaintiff on April 4, 2002 and
later.  Ms. Walker determined on April 4, 2002 that the
plaintiff needed psychiatric hospitalization, was suicidal, and
that she understood that information of dangers to her self and
others might be disclosed to persons and agencies needing to
know that information.  She explained the considerations
leading to the disclosures that she made, the scope and

7

limitations of those disclosures and what was disclosed.  She
made disclosures to Brenda Sampson, Lt. Col. Crabtree, Ginger
Wilson-Gines and Ines Roe.

Dr. Richard Sleber, a psychologist, testified that the
plaintiff, as a result of a breach of confidentiality,
experienced emotional distress and a loss of trust in mental
health professionals.  Since the disposition of this case is
found to involve the events of April 4, 2002 and is based on
our determination that the disclosures did not violate the
plaintiff's rights, we do not further summarize Dr. Sleber's
testimony.

Kathryn Ellis, a psychologist, counseled and treated
the plaintiff from June of 2002 until approximately June of
2003.  She saw the plaintiff on 34 separate occasions.  Kathryn
Ellis' testimony does not relate to the issues involving the
events of April 4, 2002 and is not further summarized herein.

Dr. Christine Maier, M.D. testified that, as the
plaintiff's primary care physician, when on April 4, 2002 she
saw the plaintiff, observing her to be depressed and expressing
suicidal thinking, she referred the plaintiff to the behavior

8

health clinic.  Dr. Maier stated that it was appropriate for clinic staff to notify the service member's (spouse's) commander to arrange for transport to the hospital.  She stated that throughout her primary care role for the plaintiff, psychiatric treatment for depression was a constant part of the plaintiff's treatment.  Dr. Maier knew from the plaintiff that her marriage was stressed.

Brenda L. Sampson testified that on April 4, 2002, she was chief of the Carlisle Barracks family support division, and was the family advocacy program manager.  On April 4, 2002, the plaintiff came to the clinic, very upset, with two children.  Ms. Sampson was notified.  The plaintiff told Ms. Sampson that she wanted to be hospitalized, wanted to talk to somebody, and wanted help for her children.  Ms. Sampson assumed care of and responsibility for the children.  Ms. Sampson went to the McFaddens' residence.  Mr. McFadden told her about difficulties and problems in the marriage.  He had scratches and bruises on him, which he stated had been done by the plaintiff.

Dr. Timothy Michaels testified that his specialty is in clinical and forensic psychiatry.   He stated his opinion that the plaintiff's personality traits contributed to the

development and maintenance of her complaints in this lawsuit.
He stated his opinion that Ann Walker acted appropriately, as a
mental health care receiver of information about a patient's
danger to herself and others, by contacting the commanding
officer to arrange for hospital transportation for the
plaintiff.  He stated that disclosures are necessary in some
psychiatric or mental health emergencies.

Ginger K. Wilson-Gines testified.  She is the Chief of
the behavioral health clinic of the Dunham Army Health Clinic,
Carlisle Barracks.  On April 4, 2002, she was the chief of
social work services.  She stated that on April 4, 2002, Ann
Walker and she discussed at length the information that Walker
had obtained in her clinical assessment of the plaintiff, and
that the decision was jointly made that considerations of
safety required the plaintiff's hospitalization.  She stated
that she told Walker that it would be necessary to call
Lt. Col. Crabtree because no other source of transportation was
known to be available and because the commander is responsible
for military members and family members.

Ms. Wilson identified Army regulations that address
suicide prevention, privacy of military records, and spouse and

child abuse inquiries, including forms explaining to a patient that disclosure would be made by the provider of information causing the provider to believe that the patient is a danger to self or another person or to report child or spousal abuse.

Ines Roe, a counselor at the Dunham Clinic on April 4, 2002, testified that she and Ann Walker conferred on April 4, 2002 about the plaintiff.  She stated that the plaintiff, when at one point it appeared that a hospital bed for her might not be found, shot up from her seat and emotionally declared, "Well, then, I might as well go home and kill myself."

Deposition testimony of Gunnery Sergeant Michael McDonald, Lt. Col. Dale Crabtree and Austen Gray, M.D., was presented.

McDonald stated that Lt. Col. Crabtree asked him on April 4, 2002 if he could help by taking the plaintiff to the hospital.  Ann Walker did not speak directly to McDonald, except to tell him where to take the plaintiff.  Lt. Col. Crabtree did not provide details to McDonald.  Rodney McFadden had told McDonald that there were issues between Rodney and the plaintiff.  McDonald did not actually take the plaintiff to the

hospital.  McDonald's understanding from Rodney McFadden was that the plaintiff "had post partum depression."

Lt. Col. (Retired) Dale Crabtree stated that he was "senior Marine assigned to the Command."  Sgt. McFadden was under his command.  On April 4, 2002, Crabtree was contacted and asked to arrange for transportation of the plaintiff to the hospital.  He spoke to Sergeant McDonald, and asked McDonald and his wife to transport the plaintiff.  Crabtree does not remember being told details of what the plaintiff had said or done, but does recall being told that she did not want to have her husband take her to the hospital.   He does not recall whether he was told about the plaintiff's mental health on April 4, 2002.  He had been told about issues in the marriage and about the plaintiff's "post partum depression" by Sgt. McFadden.

Crabtree is sure that he told all the Marines to "kind of keep an eye on Rodney, make sure everything was ok," and he may have told them that "they were having personal problems or something of that nature."  He acknowledges that he may have issued an order prohibiting Sergeant McFadden from having contact with his wife.

Dr. Austen Gray, a psychiatrist, counseled the plaintiff in 2004.  His testimony is not relevant to the court's analysis of the issues and resolution of the material issues.

### *Discussion.*

The plaintiff's first claim (Count I) is that there was a breach by the defendant in the capacity of a mental health care provider of the right of confidentiality of the plaintiff under Pennsylvania law.  Under Pennsylvania law, when there is a doctor-patient relationship, the doctor's disclosure of highly sensitive, confidential information without the patient's consent is actionable.  *Moses v. McWilliams*, 379 Pa. Super. 150 (1988), *appeal denied*, 521 Pa. 630 (1989).  Here, the plaintiff prior to her disclosures to the provider acknowledged her awareness of potential disclosure by the provider to report child or spousal abuse or to report that the plaintiff was a threat to herself or others.  We do not find the disclosures that were made to have exceeded the scope of the plaintiff's acknowledgment and consent.

Count III claims a violation of the Pennsylvania Mental Health Procedures Act.  Under the Pennsylvania Mental Health Procedures Act, 50 P.I. § 7101, *et seq.*, disclosures with written consent are permitted.   50 P.S. § 7111.  The plaintiff gave written consent to disclosures made to report possible spouse abuse or a possibility of harm to self or others, and the disclosures that were made were made for these purposes, to address these concerns, and were not made to an unnecessarily broad scope of persons and did not disclose unnecessarily disclosed information.

The plaintiff argues that disclosure should be limited to a situation where there is a specific and immediate threat of serious bodily injury, and that there was not such a threat presented here.  In *Emerich v. Philadelphia Center for Human Development*, 554 Pa. 209 (1998), cited by the plaintiff, the Court held that a mental health professional may have a duty to warn third person(s) of a threat in some circumstances.  The plaintiff's position is that a mental health care provider has the duty to the patient to keep communications, diagnosis and treatment completely confidential, that the plaintiff did not waive her right to confidentiality, and that nothing else in the events of April 4, 2002 justified any disclosures by

14

Ms. Walker.  *Doc. 61, pp. 16-20.*  We do not agree that there
was not a consent to disclosure here and we do not agree that
the events of April 4, 2002 did not justify reasonably limited
disclosures.  In relying upon *Emerich*, *supra*, the plaintiff
implicitly asserts that as a matter of law the circumstances
where disclosure may be made without violation of the patient's
confidentiality rights are the same as the circumstances where
disclosure must be made to permit person(s) in potential danger
from the patient to be warned of the potential danger.  *Doc.
61, pp. 20-24.*  The plaintiff erroneously relies upon cases
involving the issue of duty of the mental health care provider
to warn in this case involving the issue of the duty of the
mental health care provider not to disclose.  The plaintiff
asserts that "if a therapist does not find facts that draws her
to a conclusion that a specific victim must be warned, then the
duty of confidentiality must be obeyed" *Doc. 61, p.24, No. 113.*
The plaintiff's narrow construction of the therapist's
discretion errs because the therapist is not under the law
precluded from reasonable disclosure(s) to protect the life of
the patient.  The therapist is not precluded from prudent
disclosure, for example, to prevent the patient from harming
herself.  The fact finder here has found that reasonable
disclosures were made to protect the life of the patient.

The plaintiff's arguments fail to consider and to address the balancing of interests that the therapist, particularly a therapist who is also a family advocacy specialist, must consider.  She must consider not only the confidentiality interests of the patient making disclosures, but also the safety interests of family members and of the patient making disclosures.  The fact of notice and consent in this case is, under the facts of this case, determinative.

The plaintiff claims (Count IV) an invasion of her right to privacy.  The plaintiff's consent to disclosure, the fact that disclosure was made consistent with the plaintiff's consent and did not extend beyond the reasonable scope of the consent, is dispositive here as well as to the plaintiff's assertion of a claim of an invasion of her right to privacy. It is an element of the privacy invasion cause of action asserted by the plaintiff that the disclosure would be highly offensive to a reasonable person.  A disclosure that is made pursuant to and consistent with a written consent to disclose is not a disclosure that would be highly offensive to a reasonable person.  A reasonable person providing information to a therapist and family advocacy manager reasonably understood to imply the person's apprehension that she may harm

16

herself or her children and that she and her husband are
involved in volatile confrontations would not be highly
offended by the disclosure of such information to persons in a
position to provide help when disclosure is reasonably
calculated to increase the safety of the person and her family.

The Social Work Information Form, which the plaintiff
signed, stated that information provided by the plaintiff might
be disclosed without further consent from her if the health
care provider believes that she intends to harm herself or
someone else or in situations of suspected child or spouse
abuse.  The plaintiff was distraught when she signed the form,
and she may have failed to recognize that she was acknowledging
potential disclosure.  In evaluating whether the defendant
acted in violation of the plaintiff's rights, the notice and
the advice given to the plaintiff is found to have been
adequate to justify the clinic staff in believing that adequate
notice had been given and that consent had been given.

***Findings of Fact.***

1.   The plaintiff on April 4, 2002 lived on the Army War College Barracks at 215-B Marshall Road, Carlisle, Pennsylvania, with her husband, Gunnery Sergeant Rodney McFadden, and their five children.  On that day she was depressed, and she had thoughts of ending her life.  She went to the Barracks medical center, the Dunham Clinic, for her child's doctor appointment on that day.  While there, she told the pediatrician how she was feeling.  She was referred to Dr. Maier, her primary care provider.  Dr. Maier referred her to the social work department at the clinic.

2.   The plaintiff was seen by Ann Walker, who is an employee and agent of the United States Department of Army and the United States of America.  Ann Walker is a clinical social worker, therapist, and a family advocacy case manager at the Clinic.

3.   Ann Walker began to provide therapy and mental health treatment to the plaintiff on April 4, 2002.

4.   The plaintiff's mental and emotional condition on
April 4, 2002 led Ann Walker to feel that the plaintiff's
condition presented a crisis and an emergency.

5.   The plaintiff revealed information to Walker about
her life, her marriage, her pregnancies and her mental state.

6.   The plaintiff expressed to Walker that the
plaintiff had thoughts of killing herself.

7.   Walker concluded that the plaintiff should be
hospitalized for psychiatric reasons.   The plaintiff agreed.

8.   Ann Walker and her superior, Ginger Wilson-Gines,
determined that the commanding officer of the plaintiff's
husband should be told that the plaintiff was to be
hospitalized.   The primary purpose for contacting Lt. Col.
Crabtree was to ask him to arrange for the transportation of
the plaintiff to the hospital.

9.   The plaintiff had signed forms at the Dunham Clinic
in which, among other things, she acknowledged that the health
care provider would disclose information when the provider

19

considers the patient to be a threat to herself or others or to report child abuse or spousal abuse.  Ann Walker had spoken to the plaintiff and the plaintiff had said that she understood the forms.

10.   Plaintiff signed the following consent forms: (1) Privacy Act Form; (2) Patient's Rights - Social Work Services form; (3) Patient's Rights - Informed Consent form.

11.   The forms explained the limits of confidentiality, the fact that medical records are property of the Government and would be kept in accordance with military regulations, and the duty of the provider to disclose information when he or she believes the patient to be a threat to herself or others or to report child or spouse abuse.

12.   The plaintiff had refused to sign a form in which she was to have by signing it agreed not to kill herself, attempt to kill herself or harm herself.

13.   The plaintiff asked Walker not to contact Lt. Col. Crabtree, because she did not want other persons to know of the state of her marriage or of her need for hospitalization.

14.   The plaintiff eventually agreed with Walker's plan to contact Lt. Col. Crabtree to have him arrange for the plaintiff to be transported to the hospital.

15.   Although Lt. Col. Crabtree arranged for transportation to the hospital by Sergeant McDonald, the plaintiff was eventually transported to the hospital by ambulance.

16.   In the course of discussions between Walker and Lt. Col. Crabtree, information was disclosed by Walker to Lt. Col. Crabtree about the plaintiff's circumstances and personal life.   No record was made of the exact disclosures.

17.   The plaintiff told Ms. Walker about her life, her marriage, her pregnancies and her mental state.   She told Ms. Walker of volatile confrontations with her husband and of her feelings that she might harm members of her family or herself.

18.   Ann Walker thought on April 4, 2002 that the plaintiff was a danger to herself.

19.   The plaintiff was reasonably seen by Ann Walker on April 4, 2002 to be a patient who was a danger to herself; that is, a person who might kill herself.

20.   Disclosures reasonably necessary to prevent the plaintiff from attempting to kill herself were reasonably seen by Ann Walker on April 4, 2002 to be necessary.

21.   The disclosures made by Ann Walker on April 4, 2002 were not beyond the scope of those reasonably necessary to prevent the plaintiff from harming herself and/or a family member.

22.   The plaintiff has failed to show that the defendant did not take steps reasonably intended to provide adequate notice to the plaintiff that disclosure would be made by the clinic therapist where such disclosure was reasonably necessary.

23.   The plaintiff's April 4, 2002 conduct and statements were reasonably seen by clinic staff to give rise to a concern of a danger to herself and to other persons.

24.  Both the staff and the plaintiff determined there to be a need for the plaintiff to be hospitalized.

25.  The Clinic staff needed to arrange for the plaintiff's transportation to the hospital and for the communication of the limited items of need-to-know information to the military command and to the plaintiff's husband.

26.  The plaintiff's husband needed to know of the plaintiff's hospitalization because he would need to watch the couple's children.

27.  The plaintiff did not want her husband to take her to the hospital, so arrangements for other transportation to the hospital needed to be made.

28.  The military commander needed to know of the fact that a service member's spouse who lives on the military installation had presented through conduct and communications that she or he is a danger to self and other persons and of the fact that the member's spouse is to be transported to a hospital for psychiatric hospitalization.

29.   In the circumstances presented here, the military commander reasonably determined it to be necessary and appropriate to arrange for the transportation of the resident spouse to the hospital, and this was reasonably and appropriately done by Lt. Col. Crabtree, the commanding officer, by arranging to have Gunnery Sergeant McDonald transport the plaintiff to the hospital.  When the plaintiff asserted that it was not acceptable to her for Sergeant McDonald to transport her, arrangements were made for her to be transported by ambulance.

30.   There is no evidence of inappropriate disclosures by the commanding officer.

### *Conclusions of Law.*

1.   The plaintiff consented to the disclosure of information possessed by Ann Walker as the result of communications made to Walker by the plaintiff on April 4, 2002 to the extent that the communications were made to prevent the plaintiff from harming herself or other persons.

24

2.   The disclosures made by Ann Walker were made for the purpose of preventing the plaintiff from harming herself.

3.   The disclosures made by Ann Walker were made to appropriate professional workers and public authorities.

4.   The plaintiff has not shown by a preponderance of the evidence that there has been a breach of a confidential relationship, that there has been a violation of her rights under the Mental Health Procedures Act of Pennsylvania or that there has been a violation of her right to privacy.

5.   The defendant did not breach a right of the plaintiff to confidentiality, did not violate the Pennsylvania Mental Health Procedures Act and did not unlawfully or unjustifiably invade the privacy of the plaintiff.

6.   The disclosure(s) that were made by the staff of the Social Work Clinic to the Commanding Officer of the Carlisle Barracks concerning the fact of and the circumstances of the plaintiff's visit to the Clinic and concerning information stated to staff by the plaintiff were no broader than was reasonably necessary on the basis of the information

known to staff and on the basis of a reasonable consideration of all of the interests involved.  The interests involved were those of the plaintiff's own well-being, the interests of her children and the interest of the Barracks command in safely and securely administering a military installation where service members and their spouses and families are in residence.

***Conclusion.***

On the basis of the foregoing, the court finds in favor of the defendant.  It is ordered by separate order that judgment in favor of the defendant be entered.

***/s/ J. Andrew Smyser***
_____ J. Andrew Smyser
Magistrate Judge
Dated:  June 16, 2005.